FILED
2022 Mar-03 AM 09:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOSHUA BENNEFIELD,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | |
| **LINCOLN NATIONAL LIFE** | ) | _____ |
| **INSURANCE COMPANY; and** | ) | |
| **LINCOLN LIFE ASSURANCE** | ) | |
| **COMPANY OF BOSTON f/k/a** | ) | |
| **LIBERTY LIFE ASSURANCE** | ) | |
| **COMPANY OF BOSTON,** | ) | |
| | | |
| **DEFENDANT.** | | |

## COMPLAINT

Plaintiff Joshua Bennefield ("Plaintiff") brings this action for violations of the Employee Retirement Income Security Act of 1974 committed by Lincoln National Life Insurance Company and Lincoln Life Assurance Company of Boston ("Lincoln Life"), formerly known as Liberty Life Assurance Company of Boston, in connection with the provision of ERISA-governed disability benefits under a group insurance plan sponsored by Plaintiff's former employer, Wal-Mart, Inc. In support of the relief requested herein, Plaintiff alleges the following upon personal knowledge as to himself and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through his attorneys:

1

## INTRODUCTORY STATEMENT

1.     This is an action for legal and equitable relief seeking redress of violations of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA").  This suit is brought pursuant to 29 U.S.C. § 1132(a) to secure disability benefits due to Plaintiff through the group insurance policies sponsored by Walmart, Inc.

2.     The Plaintiff seeks all benefits to which he may be entitled should this Court determine he is "disabled," including long-term disability benefits under policies issued or administered and underwritten by Lincoln Life.

3.     Plaintiff seeks such benefits together with any other disability-related benefits his plan may provide based on the conditions documented in his medical records, including specifically chronic pancreatitis with pseudocysts.

4.     Pancreatitis is inflammation in the pancreas. The pancreas produces enzymes that help digestion and hormones that help regulate the way the body processes sugar (glucose). Pancreatitis can occur as acute pancreatitis — meaning it appears suddenly and lasts for days. Or pancreatitis can develop into chronic pancreatitis as it has with the Plaintiff.  This form of pancreatitis occurs over many years.

5.     Symptoms of this disease include upper abdominal pain, abdominal pain that feels worse after eating, fever, rapid pulse, nausea, vomiting, and

2

tenderness when touching the abdomen. During an acute attack, there is the potential for the pancreas to be destroyed within a matter of hours and complications can be life-threatening. The cause of chronic pancreatitis is unknown.

6.     Plaintiff has undergone evaluations at UAB Medical Center and Vanderbilt Digestive Disease Center for this condition. He continues to suffer daily abdominal pain, fatigue, and difficulties with eating, punctuated by intense flares where these symptoms significantly worsen to the point of almost complete incapacitation. Because of these symptoms, including specifically his pain, nausea, and frequent, yet intense, episodes of general gastrointestinal distress, Plaintiff is unable to return to work in any fulltime capacity, including to his former occupation with Wal-Mart as a forklift driver.

## **JURISDICTION**

7.     Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" and/or an "employee pension plan" as those terms are defined within 29 U.S.C. § 1001, et. seq. The Plan "may be found" within this district.

8.     Jurisdiction is further appropriate under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties.

3

9.     Venue is appropriate in this District Court pursuant to 29 U.S.C. § 1132(e)(2), in that the employee welfare benefit plan at issue was at least partly administered in this District and Defendant may be found or resides in this District.

## PARTIES

10.     Plaintiff Joshua Bennefield, a resident and citizen of Cullman County, Alabama, is a participant in the Plan and thus entitled to benefits available thereunder.

11.     Defendant Lincoln National Life Insurance Company, as successor in interest to Lincoln Life Assurance Company of Boston by way of merger in October 2021, is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

12.     Defendant Lincoln National Life Insurance Company, which handled part of the appeal administration for this claim according to it January 2022 letter referenced herein, is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

13.     One of Lincoln National Life Insurance Company's designated agents for service of process is:

> Lincoln National Life Insurance Company
> 641 South Lawrence Street
> Montgomery, AL 36104

4

14.    Lincoln National Life Insurance Company is an entity exercising authority or control respecting the management or disposition of Plan assets or the personnel exercising said authority over Plan assets.

15.    Lincoln National Life Insurance Company is an entity providing services to The Plans at issue.

16.    Lincoln National Life Insurance Company is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

17.    Defendant Lincoln Life Assurance Company of Boston, formerly known as Liberty Life Assurance Company of Boston, is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

18.    Lincoln Life Assurance Company of Boston is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

19.    One of Lincoln Life Assurance Company of Boston's designated agent for service of process is:

> Lincoln Life Assurance Company of Boston
> 641 South Lawrence Street
> Montgomery, AL 36104

20.    Lincoln Life Assurance Company of Boston is an entity exercising authority or control respecting the management or disposition of Plan assets or the personnel exercising said authority over Plan assets.

5

21.    Lincoln Life Assurance Company of Boston is an entity providing services to The Plan at issue.

22.    Lincoln Life Assurance Company of Boston is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

## THE PLAN

23.    The Walmart Inc. long term disability ("LTD") plan is funded entirely by a long-term group insurance policy sold by Liberty Life Mutual Assurance Company of Boston, which has since been acquired by Lincoln Financial Group and re-named Lincoln Life Assurance Company of Boston.  Although Liberty Life underwrote this group policy, upon information and belief, administrative duties have since been assigned by that entity to Lincoln Life.  Regardless of the arrangement struck, with the exception of the appeal decision letter described herein, correspondence and communications for this claim were issued in the name of Lincoln Life, which appeared on the surface to be acting as the claims administrator.

24.    Upon information and belief, Lincoln Life has since merged with Defendant Lincoln National Life Insurance Company, whose name appears on correspondence announcing the denial of Plaintiff's appeal described below. Defendant Lincoln Life Assurance Company of Boston and Defendant Lincoln

National Life Insurance Company are hereinafter collectively referred to as "Lincoln."

25.     This group policy was purchased by Plaintiff's employer to confer certain benefits upon Plaintiff and other employees.

26.     As a result, these policies qualify as employee welfare benefit plans as defined in 29 U.S.C. § 1002(1), and Plaintiff qualifies as a participant and/or beneficiary under the Plans as that term is used in 29 U.S.C. § 1132.

27.     Under the terms of this LTD Plan providing for certain benefits accruing upon the Plaintiff becoming disabled, Plaintiff is "disabled" as this Plan defines that term, which is as follows:

> **"Disability"** or **"Disabled"**, with respect to Long Term Disability, means:
>
> 1. For persons other than truck drivers, pilots, co-pilots, and crewmembers of an aircraft:
>
>> i.      that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and
>>
>> ii.     thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

28.     The part of the disability definition applicable to Plaintiff in this case is that which relates to "Own Occupation," which the policy defines as follows:

> **"Own Occupation"**, with respect to Long Term Disability, means the Covered Person's occupation that he was performing when his Disability or Partial Disability began.  For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is performed at Wal-Mart Stores, Inc .

29.     "Material and Substantial Duties" is defined as follows:

"Material and Substantial Duties", with respect to Long Term Disability, means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.

30.     There are no Plan documents made available indicating that Lincoln has an enforceable grant of discretionary authority as Plan or Claims Administrator or that any express delegation has occurred for this Plan.

## LINCOLN LIFE'S LIABILITY

31.     Plaintiff was a forklift operator for Walmart before he stopped working in 2019 after developing chronic pancreatitis with pseudocysts.  Plaintiff has been hospitalized because of this condition numerous times.

32.     Plaintiff's essential functions included moving freight throughout a large commercial warehouse and stacking or unstacking freight or inventory usually with a forklift, but sometimes manually when situations required it.

33.     Plaintiff also had to maintain, clean and inspect equipment used at the warehouse facility.

34.     This is the type of work he has done most of his adult life.

35.     When loads would shift or fall as they many times did, Plaintiff was expected to move that load manually back onto the pallet, usually by himself, because other drivers had their own loads they were transporting.  This often involved lifting weight of up to 100 pounds, but more frequently weights between 25 and 50 pounds.  A requirement of the job, in fact, was that he be able to regularly

lift and carry merchandise and supplies that weighed up to 60 pounds without assistance.

36.    Plaintiff also had to be acutely aware of his surroundings at all times to avoid accidents with other workers or forklifts operating throughout a busy warehouse.

37.    According to an O*Net analysis, the ability to exert "maximum force" is very important to the performance of this occupation in the national economy.

38.    Plaintiff stopped working in March 2019 when his pain reached a level that he could no longer tolerate.

39.    He thereafter submitted a claim for short-term disability benefits under the Walmart, Inc. short-term disability plan, administered by Sedgwick.

40.    After an investigation into Plaintiff's condition and functionality, Sedgwick approved Plaintiff's claim, finding him to be disabled under the terms of the Walmart STD Plan.

41.    Sedgwick eventually found Plaintiff to be entitled to STD benefits through the maximum period and paid that claim in full.

42.    As Plaintiff's claim reached the end of the STD period, it transitioned to the LTD plan where Lincoln Life administered the benefit applying a disability definition that was substantially similar to that found in the STD plan.

43.    Consistent with that transitioning, in August 2019, as STD benefits

9

concluded, Lincoln commenced its administration of Plaintiff's LTD claim by requesting the completion of a number of forms by Plaintiff and his providers.

44.    Lincoln at this time also obtained claim file materials from Sedgewick's administration of Plaintiff's STD benefit.

45.    Soon after the receipt of these materials, in light of the similarly in disability definitions and there being no documented improvement in Plaintiff's conditions or functionality, Lincoln Life found Plaintiff likewise to be disabled under the LTD plan and qualified to receive its benefit going forward.  Specifically, Lincoln predicated its approval of Plaintiff's LTD benefit at that time (September 2019) on a "Recent note" and "APS form" completed by one of Plaintiff's attending physicians, finding "it is reasonable that [Mr. Bennefield] remains unable to RTW [return to work] due to pain, nausea, and referral to pain specialist for further testing and evaluation."

46.    After this initial approval, Lincoln's claims team continued to review regularly Plaintiff's treatment status for any changes.  In December 2019 during one of these reviews, Lincoln assigned Plaintiff's claim to one it its Nurse Disability Consultants, who provided a "clinical assessment" that included the following:

> …At this time, [Mr. Bennefield] is considered to have chronic pancreatitis {K86.1} with frequent acute flares, is pending f/u with GI at end of this month and second GI consult to try to determine cause of the frequent flares in pancreatitis. Due to frequent acute pancreatitis {requiring 2 hospitalizations in past 6 weeks with severe abdominal pain, nausea / vomiting, loss of appetite and mild weight loss during

these flares, R&L's [restrictions and limitations] of occasional stand / walk with frequent rest periods, no stoop / squat / crouch / climb / work at unprotected heights, no operating safety sensitive machinery and no lift / carry over 20lbs are reasonable ongoing; in addition, due to the frequent occurrence of the flares, he has not demonstrated reliable sustainable capacity for activity at any physical demand level on a full or part time basis.

47.    Over the next eleven months, Lincoln continued to collect records and approve Plaintiff's claim finding him totally disabled from his own occupation under the LTD plan.

48.    In November 2020, however, Lincoln management, after many months of approval and payment, reassigned Plaintiff's claim administration to a new claims team, at which point treatment of Plaintiff's claim markedly changed. Indeed, within three months, this new claims team, in a sharp departure from its predecessor group, managed to terminate and close Plaintiff's claim altogether without there being any new medical records or evidence suggesting Plaintiff's pancreatic damage had reversed itself or that his overall condition had substantially improved.

49.    Instead of basing its determination on new evidence, Lincoln simply reshuffled the evidence that supported its findings of continued disability up to that point. A March 16, 2021, "peer review" of past medical records by Dr. Jeffrey Danzig on behalf of Reliable Review Services ("RRS"), a frequent Lincoln Life claim administration vendor, reveals this tactic where it finds that the exact same issues upon which the original approval of the claim was based – i.e., "pain" and

"nausea" – on their face cannot support continued disability because these complaints are "subjective," and therefore do not constitute "objective evidence of functional impairment…."

50.    Two days later on March 18, 2021, Lincoln's new claims team gleefully accepted this review at face value with no discussion evident in its claim notes and issued a letter to Plaintiff the following day informing of the termination and closure of his LTD claim.

51.    Understandably surprised and incensed at this abrupt departure in the treatment of his claim, Plaintiff contacted Lincoln inquiring about the termination of his claim and what he needed to do to address it. He was then instructed he needed to inform Lincoln that he wished to appeal this decision, which he very quickly did. Lincoln acknowledged that appeal on March 25, 2021.

52.    Soon after the appeal, Lincoln Life's appeals team assigned to Plaintiff's claim arranged for another vendor review of medical records, which this time was performed by a different vendor, Exam Coordinator's Network ("ECN"). Dr. David Yamini, a physician contractor for ECN, like Dr. Danzig before him, again re-framed Plaintiff's complaints as being "subjective" and therefore incapable of supporting a finding of continued disability.  In doing so, Dr. Yamini, like Dr. Danzig, set aside the written statements provided by Plaintiff's providers that included professional medical findings that Plaintiff's reports were authentic and

consistent with his condition.

53.     When Lincoln provided Dr. Yamini's review (and a second review by Dr. Joel Kotin for irrelevant inquiries into psychiatric impairment which neither Plaintiff nor his providers have made a basis of this claim) to Plaintiff for comment under Department of Labor regulations, Plaintiff obtained counsel and sought an extension of his time to respond to these reviews. Lincoln granted that request.

54.     At that point, to facilitate a complete understanding of the response needed, Plaintiff, through counsel, issued a written request to Lincoln asking for a complete copy of all "relevant" materials relating to his adverse benefit determination pursuant to Department of Labor regulations.

55.     Lincoln responded to that request in August 2021, providing what it contended to be its claim file for Plaintiff.

56.     Despite it being requested to do so, however, Lincoln declined to provide any of its procedures, guidelines and policies that governed that review.

57.     Upon receipt of these materials, Plaintiff, through counsel, sequentially Bates numbered and returned those materials to Lincoln to confirm and mark what had been sent.

58.     As Plaintiff continued to send updated medical records and assessments in response to Dr. Yamini's review, Plaintiff employed this same Bates-numbering system for all materials sent to Lincoln, to the point of returning any correspondence

13

received from Lincoln with an acknowledgement letter that assigned sequential Bates numbers to such items.

59.     Each letter transmitting such materials to Lincoln identified the range being sent and, if the range was being sent separately via CD, asked Lincoln to inform promptly if any portions of the range sent was either missing or inaccessible (due to file corruption, for example).

60.     During this time, materials sent to Lincoln in response to Dr. Yamini's review included, among other things, a submission sent October 4, 2021, that included updated records from four providers, all of which were sequentially numbered in accordance with the process outlined above.

61.     The letter with the production was sent via facsimile, with the hard copy of the letter accompanying the CD the letter referenced.  This letter, as with all other letters, identified the Bates range for the documents included on the CD.

62.     The transaction confirmation report for the faxed version of that letter confirmed Lincoln's successful receipt of the letter, and the U.S Postal Service record for the mailing confirmed Lincoln's successful receipt of the mailed version of the letter that included the CD.

63.     At no point following the transmission of this October 4, 2021, submission did Lincoln ever contact Plaintiff to inform that it had was not able to access the materials on the CD which the letter referenced.

14

64.     In addition to this submission, Plaintiff also sent other materials to Lincoln on October 26, 2021.  This submission, which completed the response to peer review that Lincoln previously invited, included a sworn statement from the Plaintiff describing the frequency and duration of his attacks and their impact on his day to day functioning, a detailed assessment of functional limitations from Dr. Adam Harrison, Plaintiff's internist, and updated records from another one of Plaintiff's providers that he had not yet been received when the above-referenced October 4, 2021 package was sent.

65.     Responding to Lincoln's reviewers' repeated references to the absence of "objective evidence" (which Lincoln's LTD policy defines as including "facts and findings, including, but not limited to … consulting physician reports…"), Dr. Harrison's assessment attested to Plaintiff's inability to exert any meaningful levels of force, the need for copious amounts of rest after a single hour of exertion (because exertion exacerbates Plaintiff's condition), the objectively observed severity of Plaintiff's pain, and Plaintiff's inability to make it through a single full-time work day due to these and other similarly noted findings.

66.     In December 2021, Lincoln opted to submit these records to a different physician entirely for reasons that are not clear.  This new physician, Dr. Ravi Ravinuthala, was also a contractor of ECN, Lincoln Life's vendor review service.

67.     In referring the matter to Dr. Ravinuthala, however, Lincoln did not

include Plaintiff's materials sent October 4, 2021. This is confirmed by Dr. Ravinuthala's report, where he omits reference to those records, either in his narratives or in his listing of materials reviewed.

68.     Interestingly, Lincoln's claim record since provided to Plaintiff mysteriously notes in an entry dated December 8, 2021, "that info most recently submitted to ECN was not included though it was sent to them." It is not clear if this passage refers to the October 4, 2021, submission referenced above, or some other batch of records that became a victim of similar mishandling by Lincoln and/or ECN.

69.     In reviewing the October 26, 2021, submission, however, Dr. Ravinuthala, like his predecessors, stated that medical opinions addressing "self-reported symptoms" do not constitute evidence of disability – a statement directly at odds with Policy language defining what constitutes evidence of disability. Indeed, Dr. Ravinuthala's statement also contradicts the very essence of the findings made by Lincoln Life's original claims team that Plaintiff was totally disabled because of "pain, [and] nausea", *also* conditions that can only be self-reported by the Plaintiff and cannot be measured or otherwise identified through any form of diagnostic testing.

70.     Two weeks later, in a letter dated January 3, 2022, Lincoln's appeals team issued a formal denial of Plaintiff's appeal based on Dr. Ravinuthala's report.

71.     Despite the issuance of this new peer review by a new physician

reviewer, Lincoln did permit Plaintiff an opportunity to respond to it in compliance with Department of Labor regulations before informing of the denial of his appeal and the unavailability of further review. This is a clear violation of amended regulations that results in Lincoln's forfeiture of any possibility of deferential review pursuant to any purported reservation of discretion in relevant Plan documents.

72.    After receipt of this denial of Plaintiff's appeal, Plaintiff, through counsel, requested an updated production of all "relevant" materials under Department of Labor regulations on January 5, 2022.

73.    Lincoln responded to Plaintiff's foregoing request under cover of its letter dated January 7, 2022, which was received over one week later.

74.    As with Lincoln's original production in August 2021, Plaintiff again sequentially Bates numbered the materials received and returned them to Lincoln to confirm them in his claim record. A review of those materials Plaintiff received, however, revealed the record Lincoln provided to be facially incomplete. Specifically, that production omitted the October 4, 2021, submission referenced above.

75.    There are other suggestions beside this that Lincoln "scrubbed" its production. For example, there are no notes or communications from Dr. Yamini about his purported "unavailability" to respond to the October 2021 submissions Plaintiff provided. There also are no draft reports of any kind and there is

surprisingly little documentation of the level of administrative activity one would expect preceding the original termination and closure of Plaintiff's claim and also the denial of Plaintiff's appeal.

76.     Plaintiff has attempted to raise these concerns over the completeness of its production in a letter dated February 8, 2022, but has received no response.

77.     Lincoln's administration of this claim involves numerous other regulatory and plan breaches and errors, including:

(a)     The failure to maintain adequate claims procedures, or any procedures *at all*, in compliance with Department of Labor regulations;

(b)     The targeting of Plaintiff's claims for denial because ERISA governs;

(c)     The failure by Lincoln to take any meaningful measures to insulate its claims process from its inherent conflict under the Supreme Court case *Glenn v. MetLife* and instead allowing its profit motive to influence its claims administration for Plaintiff;

(d)     The withholding of relevant documents and information from Plaintiff throughout the claims process and depriving Plaintiff of the ability to obtain a full and fair review of his claim as noted above;

(e)     Taking an adversarial posture against Plaintiff instead of a fiduciary posture by searching for ways to avoid paying part or all his claim;

(f)     Failing to conduct an adequate investigation, and not considering and/or according proper weight to relevant, supportive information;

(g)     Misapplying LTD plan terms by converting it into a policy that insures only conditions for which there are available diagnostic tests, and creating a non-existent policy exclusion for any condition that relies on patient reports;

(h)     In conflict with its previous determination of disability, inconsistently and arbitrarily finding that Plaintiff could return to work despite there being no evidence of substantial medical improvement;

(i)     Failing to accord any weight to Plaintiff's medical providers and other examiners who personally examined the Plaintiff, some on a regular basis; and

(j)     Failing to provide Plaintiff with an opportunity to respond to the new medical review provided through Dr. Ravinuthala before

denying Plaintiff's appeal and informing in clear terms that no further review would be conducted.

78.    Despite Plaintiff's established disability and entitlement to coverage under the terms of the LTD Plan, Lincoln continues to consider Plaintiff not to be "disabled" and unqualified for LTD benefits.

79.    As set forth above in connection with Lincoln's fiduciary breaches, Lincoln's claim decision was the product of a conflict of interest whereby it allowed its own financial interests to supersede its fiduciary obligations to Plaintiff.  Under *Glenn*, this presents an additional reason for application of a *de novo* standard to their claims decision.

80.    This conflict of interest further calls into question the credibility of Lincoln's claims personnel and reviewers who behaved dishonestly and who openly defied Plan terms and department of labor regulations.

81.    Lincoln considered the applicability of ERISA before making its decision.  This presents an additional reason for application of a *de novo* standard to their claim decision.

82.    Lincoln did not provide Plaintiff with a meaningful opportunity for a full and fair review of this claim for benefits as required by 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-1, and instead actively tried to subvert Plaintiff's ability to protect his right to such a review.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Joshua Bennefield respectfully requests this court find jurisdiction and venue appropriate, and after trial, grant the following relief:

a.      For an order awarding Plaintiff all benefits due and owing in accordance with the terms of the Plan and Policy, as well as all prejudgment interest due thereon as permitted by law and equitable principles, pursuant to 29 U.S.C. § 1132(a);

b.      For a judgment against the Defendants awarding Plaintiff all costs and reasonable attorney's fees incurred connected to the prosecution of and pursuit of relief in this action as permitted under 29 U.S.C. § 1132(g)(1);

c.      For an order requiring Defendants to provide Plaintiff with any additional benefits to which the Plaintiff would be entitled pursuant to a finding that the Plaintiff is disabled under The Plan(s); and

d.      Such other relief as may be deemed just and proper.

Respectfully submitted,

M. Clayborn Williams (ASB-9101-A43M)
**The Martin Law Group, LLC**
**Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402
Phone (205) 343-1771
Facsimile (205) 343-1781
clay@erisacase.com

**Plaintiff's Address:**

Joshua Bennefield
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**Defendants' Address:**

Lincoln Life Assurance Company of Boston
641 South Lawrence Street
Montgomery, AL 36104

Lincoln National Life Insurance Company
641 South Lawrence Street
Montgomery, AL 36104